**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS**

**JAMES A. RYMAN,**

        Plaintiff,

**v.**

**CAROLYN W. COLVIN,
Acting Commissioner of Social Security,**

        Defendant.

**CIVIL ACTION NO.: 2:16-CV-37
(BAILEY)**

## REPORT AND RECOMMENDATION

## I.   INTRODUCTION

On May 6, 2016, Plaintiff James A. Ryman ("Plaintiff"), through counsel Scott B.

Elkind, Esq., filed a Complaint in this Court to obtain judicial review of the final decision

of Defendant Carolyn W. Colvin,[1] Commissioner of Social Security ("Commissioner" or

"Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42

U.S.C. § 405(g) (2015). (Compl., ECF No. 1). On August 26, 2016, the Commissioner,

through counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an

Answer and the Administrative Record of the proceedings. (Answer, ECF No. 3; Admin.

R., ECF No. 4). On September 27, 2016, and October 24, 2016, Plaintiff and the

Commissioner filed their respective Motions for Summary Judgment and supporting

briefs. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 7; Def.'s Mot. for Summ. J.

("Def.'s Mot."), ECF No. 10). The matter is now before the undersigned United States

Magistrate Judge for a Report and Recommendation to the District Judge pursuant to

---

[1] The undersigned notes that, on January 23, 2017, Nancy A. Berryhill became the
Acting Commissioner of Social Security.

28 U.S.C. § 636(b)(1)(B) and LR Civ P 9.02(a). For the reasons set forth below, the undersigned finds that substantial evidence supports the Commissioner's decision and recommends that the Commissioner's decision be affirmed.

## II.  PROCEDURAL HISTORY

On January 15, 2013, Plaintiff protectively filed a Title II claim for disability and disability insurance benefits ("DIB"), alleging disability that began on May 20, 2010. (R. 10, 144). Because Plaintiff's earnings record shows that he acquired sufficient quarters of coverage to remain insured through March 31, 2015, Plaintiff must establish disability on or before this date. (R. 10). Plaintiff's claim was initially denied on April 23, 2013, and denied again upon reconsideration on July 15, 2013. (R. 72, 83). After these denials, Plaintiff filed a written request for a hearing. (R. 86).

On October 16, 2014, a video hearing was held before United States Administrative Law Judge ("ALJ") Geraldine H. Page in Roanoke, Virginia. (R. 10, 21, 26). Mark Hileman, an impartial vocational expert, appeared and testified in Roanoke. (R. 10, 26, 28). Plaintiff, represented by Alan J. Nuta, Esq., appeared and testified in Martinsburg, West Virginia. (R. 10, 26, 80). On December 8, 2014, the ALJ issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act. (R. 7). On March 4, 2016, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (R. 1).

### III. <u>BACKGROUND</u>

**A.   Personal History**

Plaintiff was born on August 7, 1959, and was fifty-three years old at the time he filed his claim for DIB. (See R. 49). He is 5'9" tall and weighs approximately 150 pounds. (R. 165). He lives with his mother in a mobile home. (R. 172). He completed school through the tenth grade and has received training as an automobile mechanic. (R. 166). His prior work experience includes working as a backhoe operator and a loader operator. (R. 43). He alleges that he is unable to work due to the follow impairments: (1) allergies; (2) breathing problems; (3) a back and neck injury and (4) feet injuries. (R. 165).

**B.   Medical History**

**1.   Medical History Pre-Dating Alleged Onset Date of May 20, 2010[2]**

On August 30, 2009, Plaintiff presented to the emergency room at Jefferson Memorial Hospital after being involved in a motor vehicle accident. (R. 288). Plaintiff stated that he was riding his motorcycle when another vehicle collided with him, knocking him off his motorcycle. (R. 307). Plaintiff further stated that, when he was knocked from his motorcycle, he landed on his left side in a patch of grass. (Id.). X-rays of Plaintiff's left forearm, left wrist, left hand and left hip were ordered, all of which were normal. (R. 289, 294). Therefore, Plaintiff was diagnosed with left hand and left hip contusions. (R. 289, 295). Plaintiff was prescribed Percocet for his pain and discharged home. (R. 293, 296).

---

[2] Plaintiff has stated that "[he] did not have any medical insurance since before [his] disability onset date of May 20, 2010[,] at least through the date of the [ALJ's] decision in this case" and that, therefore, "[he] could not afford all of the treatment and medical tests that [he] needed." (R. 219).

On September 2, 2009, Plaintiff presented to the office of Robert Jones, M.D., his primary care physician, complaining of continuing pain in his arms and legs following his accident. (R. 307). Plaintiff also stated that he was experiencing difficulty sleeping due to "seeing headlights" when attempting to sleep. (Id.). After an examination, Plaintiff was diagnosed with limb pain, a hand contusion and an unspecified state of anxiety. (R. 308). Dr. Jones prescribed Vicodin for Plaintiff's pain and temazepam for his insomnia. (Id.). Dr. Jones also instructed Plaintiff to soak his left hand in warm water four times a day. (Id.).

Over the next two months, Plaintiff continued to seek care from Dr. Jones following his accident. On September 4, 2009, Dr. Jones instructed Plaintiff to take ibuprofen in addition to his Vicodin prescription to treat his pain. (R. 306). On September 11, 2009, Dr. Jones ordered additional X-rays of Plaintiff's left hand and fingers after Plaintiff reported an inability to form a fist with his left hand. (R. 304). After the X-ray results showed no abnormalities, Dr. Jones ordered Plaintiff to cease working for two weeks and to participate in physical therapy. (R. 304, 311). On September 18, 2009, Dr. Jones documented that Plaintiff's left hand pain and stiffness had improved. (R. 301). However, on October 5, 2009, after Plaintiff completed his two weeks of physical therapy, Dr. Jones noted that Plaintiff continued to experience stiffness in his third, fourth and fifth fingers. (R. 300). On October 23, 2009, after Plaintiff again complained of stiff fingers and left hand and elbow pain, Dr. Jones diagnosed Plaintiff with a hand sprain and prescribed Percocet and naproxen for his pain. (R. 298).

## 2. Medical History Post-Dating Alleged Onset Date of May 20, 2010

On July 21, 2010, Plaintiff presented to Maryland Orthopedics, P.A., for an evaluation of his left hand. (R. 313-14). William J. Launder, M.D., evaluated Plaintiff. (R. 314). During the evaluation, Dr. Launder noted that, while Plaintiff could fully flex and extend all of his fingers, Plaintiff experienced tenderness in his fourth and fifth fingers and a weakened grip. (R. 313). After the evaluation, Dr. Launder diagnosed Plaintiff with a left hand contusion. (R. 314). Dr. Launder also opined that:

> The patient has reached maximum medical improvement. According to the AMA Guidelines for loss of motion alone, he has no residual impairment. His loss of grip strength[, however,] merits a 10% impairment . . . . This is the entire impairment, all of which is due to his motorcycle accident.

(Id.).

On September 7, 2010, Plaintiff presented to Dr. Jones's office, complaining of congestion and sinus pressure. (R. 255). After an examination, Dr. Jones diagnosed Plaintiff with, *inter alia*, acute sinusitis. (Id.). To treat the sinusitis, Dr. Jones prescribed an antibiotic. (R. 256). Dr. Jones also referred Plaintiff to the Mountain State ENT Center. (R. 328).

On October 6, 2010, Plaintiff presented to the Mountain State ENT Center. (Id.). During this visit, Plaintiff stated that he has suffered from allergies and sinus problems "since he was young." (Id.). Plaintiff further stated that he smokes cigarettes. (See R. 330). After an examination, Plaintiff was diagnosed with, *inter alia*, chronic sinusitis, allergic rhinitis and an enlarged thyroid. (Id.). Plaintiff was prescribed an antibiotic for his sinusitis. (Id.). Due to his enlarged thyroid, bloodwork and a thyroid ultrasound were ordered. (Id.). The bloodwork results were normal. (R. 326). The thyroid ultrasound revealed an "[e]nlarged right thyroid lobe and borderline size of the left thyroid lobe with

heterogeneity of the echotexture, but without identification of individual thyroid nodules." (R. 236). Over the following months, Plaintiff returned to the Mountain State ENT Center several times for follow-up care. (R. 320-27). Over the course of these months, Plaintiff started prescriptions of Claritin and Singulair for his allergies. (R. 324).

On December 10, 2010, Plaintiff returned to Dr. Jones's office for a follow-up appointment. (R. 254). During this appointment, Dr. Jones documented that Plaintiff's temazepam prescription was "working well" for Plaintiff's insomnia and that the Singulair prescription was providing Plaintiff with "moderate relief" of his allergy symptoms. (Id.). While Dr. Jones informed Plaintiff that he could try taking melatonin, an over-the-counter medication, to further help with his insomnia, no changes to Plaintiff's prescription regimen were implemented. (Id.).

On June 1, 2011, Plaintiff presented to the emergency room at Jefferson Memorial Hospital for a crush injury to his feet. (R. 227-28). Plaintiff stated that he had been "riding on [the] back of [a] tractor when [the] driver raised [the] rear tines and crushed [his feet]." (R. 253). X-rays of Plaintiff's feet were ordered, which were normal. (R. 227). Therefore, Plaintiff was diagnosed with a crush injury to his feet and given crutches. (R. 231, 325, 316). After being discharged, Plaintiff drove himself home. (R. 231).

On June 8, 2011, Plaintiff presented to Dr. Jones's office, complaining of, *inter alia*, tenderness in his third and fourth toes. (R. 253). After an examination, Dr. Jones diagnosed Plaintiff with a toe contusion and prescribed Motrin and Lortab for his pain. (Id.). Dr. Jones also prescribed Celexa, an antidepressant, after noting that Plaintiff reported a "quick temper" and irritability. (Id.).

On February 2, 2012, Plaintiff returned to Dr. Jones's office, complaining of pain and stiffness in his lower back and scapular region caused by "putting [a] motor in [a] car." (R. 251). After an examination, Plaintiff was diagnosed with a backache. (R. 252). Dr. Jones prescribed Flexeril and Naprosyn for Plaintiff's pain. (Id.).

Plaintiff returned to Dr. Jones's office multiple times throughout the rest of 2012. On March 14, 2012, Dr. Jones prescribed trazodone, in addition to Plaintiff's temazepam prescription, to treat Plaintiff's worsening insomnia. (R. 249). However, after Plaintiff complained that trazodone caused spasms in his legs, Dr. Jones switched the medication to Depakote on March 20, 2012. (R. 247-48). Dr. Jones again switched Plaintiff's insomnia medication on May 15, 2012, to Halcion. (R. 245-46).

On June 27, 2012, after Plaintiff complained of low back pain, Dr. Jones changed Plaintiff's pain medication to tramadol and prescribed prednisone for a limited time period. (R. 243). On November 29, 2012, however, Plaintiff reported that the tramadol was "not working" and Dr. Jones prescribed Lortab and gabapentin instead. (R. 241).

On December 29, 2012, Plaintiff complained of allergy symptoms. (R. 239). During an examination, Dr. Jones noted audible wheezes in Plaintiff's lungs upon auscultation. (Id.). Dr. Jones diagnosed Plaintiff with bronchitis. (Id.). After noting that Plaintiff was prescribed an albuterol inhaler, Dr. Jones instructed Plaintiff to keep using the inhaler as needed. (Id.). Subsequently, after Plaintiff returned to Dr. Jones's office complaining of allergy symptoms, Dr. Jones referred Plaintiff to an ear, nose and throat ("ENT") specialist for a second time. (R. 337).

On March 5, 2013, Plaintiff presented to Jefferson Memorial Hospital for various tests.[3] (R. 260-64). Specifically, Plaintiff was ordered to undergo chest X-rays, X-rays of his lumbar spine and pulmonary function tests. (Id.). While the results of the chest X-rays were normal, the X-rays of Plaintiff's lumbar spine revealed "[m]ulti-level lumber degenerative disk disease." (R. 260). The results of the pulmonary function tests revealed minimal obstructive airway disease of the peripheral airways. (R. 264).

On March 12, 2013, Plaintiff presented to Dr. Jones's office, stating that he had injured his back a week ago when carrying a bag of bath salts. (R. 335). While Plaintiff complained of low back pain radiating down to his right leg, Plaintiff stated that the pain had "gradually gotten better since the initial injury." (Id.). In addition to his back pain, Plaintiff complained of left ear drainage. (Id.). After an examination, Dr. Jones diagnosed Plaintiff with an outer ear infection and a backache. (R. 336). Dr. Jones prescribed an antibiotic for the ear infection but did not change Plaintiff's pain medication. (Id.).

Plaintiff returned to Dr. Jones's office several times over the following months. On April 30, 2013, Dr. Jones educated Plaintiff about the importance of quitting smoking and regular exercise. (R. 333-34). On May 20, 2013, Plaintiff complained of weakness, fatigue and a tingling sensation "running down [his] spine to [his] extremities." (R. 284). Dr. Jones noted that Plaintiff had recently started taking metoprolol for his hypertension. (Id.). Therefore, Dr. Jones changed Plaintiff's metoprolol prescription to diltiazem. (R. 285). Dr. Jones also diagnosed Plaintiff with obstructive chronic bronchitis after noting decreased breath sounds during auscultation of Plaintiff's lungs. (R. 284-85). On June

---

[3] These tests were ordered by Fulvio R. Franyutti, M.D., a stage agency consultant. (R. 260-64).

21, 2013, Dr. Jones prescribed an antibiotic after diagnosing Plaintiff with another episode of acute sinusitis and Lyrica for continuing complaints of pain. (See R. 282-83). On July 30, 2013, however, Dr. Jones switched Plaintiff's pain medication back to Lortab and Naprosyn after Plaintiff stated that Lyrica caused him to develop a rash. (R. 369-70). Subsequently, Plaintiff's Lortab prescription was changed to Percocet after Plaintiff described Lortab as ineffective. (R. 367).

On October 17, 2013, Plaintiff presented to the office of Byron B. Timberlake, M.D., an allergy specialist. (R. 355). During this visit, Plaintiff stated that he had suffered from sinus infections since junior high school. (R. 355-56). He further stated that his symptoms include severe headaches, left ear drainage and "brain freezes." (R. 355). After an initial evaluation, Dr. Timberlake instructed Plaintiff to take Mucinex and use a saline nasal spray. (R. 357). Dr. Timberlake also prescribed a nasal spray, Omnaris. (Id.). Subsequently, after Mucinex and nasal sprays failed to alleviate Plaintiff's allergy symptoms on their own, Dr. Timberlake instructed Plaintiff to present to his office weekly for supplemental immunotherapy injections. (R. 350-51). While Plaintiff initially obliged, he eventually stopped immunotherapy because the injections "ma[de] him feel worse." (R. 365, 377-78).

On December 17, 2013, Plaintiff presented to Dr. Jones's office, stating that he had fallen earlier that day and injured his knees and ankles. (R. 365-66). Plaintiff also complained of left hand pain and swelling and back pain. (R. 365). After an examination, Plaintiff was diagnosed with limb pain. (R. 365-66). Dr. Jones refilled Plaintiff's Percocet prescription to treat Plaintiff's pain. (R. 366). Dr. Jones also instructed Plaintiff to quit smoking, although Plaintiff stated that he had "no [current] desire to quit." (Id.).

Plaintiff continued to present to Dr. Jones's office in 2014. On March 13, 2014, Plaintiff complained of left shoulder and elbow pain and was diagnosed with joint pain, although no medication changes were made. (R. 363-64). On May 19, 2014, Plaintiff stated that his joint pain had worsened over the past couple of weeks. (R. 360). While Plaintiff's medication regimen continued without changes, Dr. Jones educated Plaintiff about the importance of smoking cessation, regular exercise and a healthy diet. (R. 361). On September 15, 2014, Plaintiff complained that he suffered from headaches when exposed to perfumes, air fresheners and deodorants. (R. 381). Therefore, Dr. Jones diagnosed Plaintiff with headaches and prescribed Fiorinal to treat the headaches. (R. 382).

### 3. Medical Reports/Opinions

#### a. Disability Determination Examination by Robert F. Webb, M.D., April 15, 2013

On April 15, 2013, Robert F. Webb, M.D., a state agency medical consultant, performed a Disability Determination Examination of Plaintiff. (R. 270-73). The Disability Determination Examination consisted of a clinical interview and a physical examination of Plaintiff. (See id.). During the clinical interview, Plaintiff stated that he suffers from a deformity of the chest cavity, insomnia, labile high blood pressures, allergies and asthma. (R. 270-72). Plaintiff further stated that he has been involved in multiple accidents in the past, resulting in chronic pain in, *inter alia*, his neck, lower back and feet. (R. 270-71). Finally, Plaintiff stated that he smokes one pack of cigarettes per day. (R. 271).

After the clinical interview, Dr. Webb performed the physical examination of Plaintiff. (R. 272-73). This examination revealed largely normal findings. (See id.).

However, Dr. Webb documented several abnormal findings. (Id.). The abnormal findings included tenderness in his feet, low back pain while sitting and rising, a "slight weakness" in the left hand's ability to grip and a pectus deformity of the lower sternum. (Id.). After completing the clinical interview and physical examination of Plaintiff, Dr. Webb diagnosed Plaintiff with: (1) chronic pain in the neck, lower back, feet and left arm; (2) an old left arm injury with possible left ulnar nerve injury; (3) tobacco abuse with a history of allergic airways disease; (4) chronic insomnia; (5) labile hypertension and (6) pectus excavatum. (R. 273).

### b. Disability Determination Explanation by John Shane, M.D., April 19, 2013

On April 19, 2013, John Shane, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Initial Level (the "Initial Explanation"). (R. 49-58). In the Initial Explanation, Dr. Shane concluded that Plaintiff suffers from the following severe impairments: sprains and strains of all types and disorders of the back, including discogenic and degenerative disorders. (R. 53). Additionally, Dr. Shane concluded that Plaintiff suffers from the following non-severe impairments: essential hypertension and chronic obstructive pulmonary disorder ("COPD"). (Id.).

In the Initial Explanation, Dr. Shane completed a physical residual functional capacity ("RFC") assessment of Plaintiff. (R. 54-56). During this assessment, Dr. Shane found that, while Plaintiff possesses no manipulative, visual or communicative limitations, Plaintiff possesses exertional, postural and environmental limitations. (Id.). Regarding Plaintiff's exertional limitations, Dr. Shane found that Plaintiff is able to: (1) occasionally lift and/or carry fifty pounds; (2) frequently lift and/or carry twenty-five

pounds; (3) stand and/or walk for approximately six hours in an eight-hour workday; (4) sit for approximately six hours in an eight-hour workday and (5) push and/or pull with no limitations. (R. 54-55). Regarding Plaintiff's postural limitations, Dr. Shane found that, while Plaintiff may frequently climb ramps/stairs, balance, stoop and kneel, he may only occasionally crouch and crawl and may never climb ladders/ropes/scaffolds. (R. 55). Finally, regarding Plaintiff's environmental limitations, Dr. Shane found that, while Plaintiff need not avoid extreme cold, extreme heat, wetness, humidity, noise or vibrations, he should avoid concentrated exposure to hazards such as machinery and heights and "[f]umes, odors, dusts, gases, poor ventilation, etc." (R. 55-56). After completing the RFC assessment, Dr. Shane determined that Plaintiff is able to perform his past relevant work as a loader operator, which he classified as medium-exertional work. (R. 57).

### c. Disability Determination Explanation by Dominic Gaziano, M.D., July 12, 2013

On July 12, 2013, Dominic Gaziano, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Reconsideration level (the "Reconsideration Explanation"). (R. 61-71). In the Reconsideration Explanation, Dr. Gaziano reviewed Dr. Shane's findings from the Initial Explanation and affirmed all of the findings. (See R. 65-70).

## C. Testimonial Evidence

During the administrative hearing on October 16, 2014, Plaintiff testified regarding his work history. Plaintiff has worked as a loader operator and, most recently, as a backhoe operator. (R. 30-31). Plaintiff stopped working in August of 2009, after he was involved in a motor vehicle accident. (R. 31-32). While Plaintiff tried to return to

work a few months after the accident and his primary care physician released him back to work, he had been replaced. (R. 32). He temporarily returned to work in 2010 when a job on a cleanup crew became available but "the job ran out." (Id.).

Plaintiff testified that he suffers from multiple physical ailments, including a left arm injury, a neck impairment, "disk disease" of his lower back, bilateral foot injuries and allergies. (R. 33-41). Regarding his left arm injury, Plaintiff suffered a crush injury during his motor vehicle accident in August of 2009. (Id.). The crush injury resulted in nerve damage to Plaintiff's left shoulder, elbow, wrist and fingers. (Id.). Due to this nerve damage, Plaintiff experiences numbness in his fourth and fifth fingers and in "the outside of [his] arm going up to [his] elbow." (R. 34). For treatment, Plaintiff performs finger exercises that he learned in physical therapy and applies heat to his hand/arm as needed. (Id.).

Regarding his neck impairment, Plaintiff injured his neck in 1978 when "kitchen cabinets fell on [him]." (R. 41). Additionally, Plaintiff has "some spurs on some disks in [his] neck." (R. 33). As a result of these conditions, Plaintiff occasionally suffers from a pinched nerve in his neck that causes him to lose the use of his right arm. (Id.).

Regarding his disk disease, the disease causes Plaintiff chronic low back pain. (R. 34). Plaintiff treats the pain by applying heat to his back and taking pain medication. (Id.). However, prior to the administrative hearing, Plaintiff had not taken his pain medication "for a couple of months."[4] (Id.). As a result of his back pain, Plaintiff experiences some difficulty walking. (R. 36). He uses a cane to walk and, on good days, is able to walk a "couple [hundred] feet" while, on bad days, he is able to walk only

---

[4] Plaintiff explained that he was unable to obtain a refill from his primary care physician because he could not go outside due to the heat and humidity affecting his breathing. (R. 35).

eleven feet. (R. 36, 40). He also experiences difficulty lifting a gallon of milk and standing or sitting for a long period of time. (R. 36-37). He estimates that he can sit in the same position for only twenty to thirty minutes at a time. (R. 36).

Regarding his foot injuries, Plaintiff suffered a crush injury to his feet when he "got them caught in a hydraulics on a Kubota tractor." (R. 38). Plaintiff continues to experience some pain in his feet as a result of the accident. (R. 37-38). Regarding Plaintiff's allergies, his allergies cause Plaintiff to suffer from sinus infections, migraines and hearing problems. (R. 35-36).

Finally, Plaintiff testified regarding his daily activities. On a typical day, Plaintiff awakens at 4:00 a.m. or 4:30 a.m. (R. 38). At this time, Plaintiff paces around his house, stretches and returns to bed. (Id.). When he later awakens again, he takes his morning medication and sits in the den until his lower back starts hurting. (R. 38-39). When his lower back starts hurting, he rises to eat breakfast and then lies down. (Id.). After a while, he will rise and walk approximately fifty feet to the mailbox to retrieve the mail before watching television for the rest of the day, getting up to stretch as needed. (Id.). At some point during the day, Plaintiff will carry the recyclables to the recycling bin near the mailbox. (Id.).

**D.    Vocational Evidence**

   **1.  Vocational Testimony**

Mark Hileman, an impartial vocational expert, also testified during the administrative hearing. (R. 43-47). Initially, Mr. Hileman testified regarding the characteristics of Plaintiff's past relevant work. (R. 43). Specifically, Mr. Hileman testified that Plaintiff has worked as a backhoe operator and loader operator. (Id.). Mr.

Hileman characterized these jobs as medium-exertional, skilled and medium-exertional, semiskilled positions, respectively.[5] (Id.).

After Mr. Hileman described Plaintiff's past relevant work, the ALJ presented several hypothetical questions for Mr. Hileman's consideration. In the first hypothetical, the ALJ asked Mr. Hileman to:

> [A]ssume an individual such as [Plaintiff] who retains the [RFC] to perform work that requires the following. Lifting and carrying no more than 50 pounds occasionally, 25 pounds frequently. Standing and walking no more than six hours in an eight-hour day, sitting for no more tha[n] six hours in an eight-hour day. Frequent climbing ramps and stairs, balancing, kneeling, crawling, stooping, crouching. Occasional stooping, and make that occasional crawling and climbing ladders, ropes and scaffolds. But the individual would need to avoid even moderate exposure to extreme temperatures and excess humidity, pollutants and pulmonary irritants. Avoid concentrates exposure to hazardous machinery, unprotected heights and working on vibrating surfaces. Frequent reaching overhead.

(R. 43-44). The ALJ then asked Mr. Hileman whether the hypothetical individual could perform Plaintiff's past work, to which Mr. Hileman responded in the negative. (R. 44). In the second hypothetical, the ALJ asked:

> [Plaintiff] at his onset date was an individual closely approaching advanced age, he's now an individual of advanced age with a limited education. Given his age, education and past work experience and given hypothetical number one[,] would there be other jobs in the U.S. or regional economy that such a person could perform?

(Id.). In response to the hypothetical, Mr. Hileman stated that such a person could work as a marker or merchandise marker, which is a light-exertional position, or as a dining room attendant, mixer operator or crate liner, which are medium-exertional positions. (R. 45). In the third hypothetical, the ALJ asked:

---

[5] Mr. Hileman stated, however, that Plaintiff's descriptions of the positions indicate that he may have performed the positions at a light-exertional level, even though they are classified as medium-exertional positions. (R. 43).

> [I]f you'll remember everything I gave you in hypothetical number one but this time the lifting and carrying would be 20 pounds occasionally, 10 pounds frequently. So light exertional level, I'm assuming the individual still could not return to past relevant work?

(Id.). Mr. Hileman responded that such an individual could not perform Plaintiff's past relevant work.[6] (Id.). In the fourth hypothetical, the ALJ asked:

> [F]or the period prior to age 55[,] given [Plaintiff's] age, education and past work experience and given hypothetical number three[,] would there be other jobs in the U.S. or regional economy that such a person could perform?

(R. 46). Mr. Hileman responded that such an individual could work as a marker or merchandise marker, small product assembler or garment folder and packager. (Id.).

Finally, the ALJ asked:

> [I]f you'll remember what I gave you in hypotheticals one or three and let's assume that [Plaintiff's] testimony is credible and that it is supported by objective medical evidence that is a part of the record and without significant contradiction. And I'm focusing on his testimony about the need to -- his need to lie down -- occurred outside of the normal breaks and lunch period such that he would be off task more than 11 percent of the workday. I'm assuming the individual still could not return to past relevant work?

(R. 46-47). Mr. Hileman responded in the affirmative and additionally stated that such an individual could not work any other jobs "in the U.S. or regional economy." (R. 47). After the ALJ's hypothetical questions, Mr. Hileman testified that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (Id.).

Plaintiff's counsel, Mr. Nuta, also presented a question for Mr. Hileman's consideration during the administrative hearing. (Id.). Specifically, Mr. Nuta asked Mr. Hileman:

---

[6] When asked whether Plaintiff possesses any transferable skills, Mr. Hileman answered in the negative. (R. 45-46).

[Plaintiff] testified that he needed a cane both for ambulation and for balance. If he did how would that affect his ability to work in the jobs you've referred to during the [ALJ's] questions?

(Id.). Mr. Hileman answered that the use of a cane would prevent an individual's ability to perform all of the jobs he previously referenced. (Id.).

### 2. Report of Contact Forms, Work History Reports & Disability Reports

In an undated Disability Report, Plaintiff indicated that he is unable to work. (R. 164-70). Specifically, Plaintiff indicated that he is unable to work due to the following ailments: (1) allergies; (2) breathing impairments; (3) back and neck injuries and (4) bilateral foot injuries. (R. 165). He further indicated that he stopped working on May 20, 2010, "[b]ecause of [his] condition(s)." (Id.).

On January 31, 2013, Plaintiff submitted a Work History Report. (R. 180-87). In this report, Plaintiff documented that he has worked as a backhoe operator and loader/operator for various companies for the past fifteen years.[7] (R. 180). When describing the duties of his most recent position as a backhoe operator for Mountaineer Excavating, Plaintiff stated that his primary duty included operating a backhoe "up and down the street scooping up as[phalt]." (R. 181). He explained that, in addition to using machines, tools and equipment, he was required to utilize technical knowledge and skills. (Id.). He further explained that, in a ten-hour workday, he was required to: (1) walk for thirty minutes a day; (2) stand for thirty minutes a day; (3) kneel for fifteen minutes a day; (4) sit for eight to nine hours a day and (5) lift items no heavier than ten pounds. (Id.). Finally, he explained that he was never required to climb, stoop, crouch, crawl, handle large or small objects, write/type or supervise others. (Id.).

---

[7] Plaintiff further details the names of his previous employers and the work he did for them on his Work Background form, dated October 10, 2014. (R. 209).

On February 15, 2013, Jill Lily, of the Disability Determination Section ("DDS") office in Clarksburg, West Virginia, completed a Report of Contact form. (R. 189). On this form, Ms. Lily reported that, although Plaintiff's records indicate a history of irritability, "a quick temper" and insomnia, he "does not allege a mental impairment and has never been treated for a mental impairment." (Id.). Therefore, Ms. Lily concluded that "[a] mental impairment is ruled out in this case." (Id.).

Kathi Regan submitted two Disability Report-Appeal forms on behalf of Plaintiff. (R. 191-05). On June 18, 2013, Ms. Regan reported that Plaintiff had experienced the following changes in his condition:

> The hot weather makes it harder for [Plaintiff] to breathe, and it causes more problems with [his] sinuses and severe headaches. [His] severe pain continues to get worse. [He] gets tired more quickly. . . . It's harder for [him] to do things because of severe pain. When [he] get[s] a headache, [he] can't do anything but lie in a cool, dark place until it goes away – sometimes 2-3 days. [He] ha[s] terrible problems being around people or in stores because of perfumes & scents which trigger severe breathing problems.[8] [He] ha[s] to rest more often because [he] get[s] tired so quickly. . . . Recently, [he has] had problems with a numb & tingling feeling throughout [his] whole body, & [he] thought [he] was going to pass out; [his] doctor had to change [his] blood pressure medication.

(R. 192). Ms. Regan estimated that these changes occurred in April and May of 2013. (Id.). On July 30, 2013, Ms. Regan reported that Plaintiff had again experienced a change in condition. (R. 201-02). Specifically, Ms. Regan reported that:

> [Plaintiff's] severe shortness of breath has worsened. It is very difficult for [him] to tolerate the heat and humidity. If [he] go[es] outside for just a few minutes, [he] get[s] soaked with sweat and ha[s] severe trouble breathing. [He] can't be in stores or places with a lot of people, because perfumes

---

[8] On December 29, 2014, M. Rudolph drafted a letter on Plaintiff's behalf, attesting to the fact that Plaintiff suffers from "severe issues with perfumes, air fresheners, etc." (R. 220). In the letter, M. Rudolph states, "I have been with him at outdoor venues and seen first hand how women's perfume or men's cologne will seriously affect him." (Id.). While not explicitly detailing how these essences affect Plaintiff, M. Rudolph further states that prolonged exposure to such essences "can incapacitate him." (Id.).

and scents trigger [his] breathing problems. Severe pain in [his] feet has also worsened. [He] can't use [his] cane any longer. [He] must use [his] crutches for support, because [his] severe pain has increased. [His] severe headaches have gotten worse. . . . [His] medications cause severe side effects.

(Id.). She estimated that these changes occurred in June of 2013. (Id.).

## E.   Lifestyle Evidence

### 1.  Adult Function Report

On January 26, 2013, Plaintiff submitted an Adult Function Report. (R. 172-79).

In this report, Plaintiff declares that he is unable to work because:

Breathing and allergy problems prevent me from working around others. Have allergies to cologne, perfume, deodorant, detergent, air fresheners, etc. These allergies cause shortness of breath, sneezing, sinus drainage, coughing. Pain in feet and back make walking difficult. . . .

[F]or at least 30 years[,] I have been getting by taking sinus medicine. And pain medi[cine] to get me through the day. Since the[n] construction has fell off. And I have hurt myself doing labor work around the house. I can't hide my back problems anymore. Contractors use[d] to overlook that I was using pain med[icine] to get through the day. But there was plenty of work then. Nobody is going to let me get on a backho[e] or loader when I need pain medi[cine] just to get in one.[9]

(R. 172, 179).

Plaintiff describes how his impairments impact his ability to perform some

activities but not others. For some activities, Plaintiff requires minimal or no assistance.

For example, Plaintiff is able to walk independently, although at times he uses a

brace/splint, cane or crutches to assist him. (R. 178). Plaintiff performs his own personal

care, although he sometimes experiences difficulty performing certain personal tasks.

---

[9] On a form entitled Claimant's Recent Medical Treatment, dated October 10, 2014, Plaintiff explained that he suffered from nerve damage in his left hand and elbow when a "car hit [him]" in August of 2009. (R. 210). Plaintiff further explained that he was informed by two physicians that neither medication nor injections would cure his allergies to perfumes and air fresheners. (Id.).

(R. 173). He is able to assist his mother, with whom he leaves, with her daily activities, such as opening her food and drink containers. (Id.). He is able to care for his pet dog, although his mother helps with pet care. (Id.). He is able to prepare meals such as sandwiches and frozen dinners. (R. 174). He is able to operate a motor vehicle independently and shop in stores. (R. 175). He is able to pay bills, count change, handle a savings account and use a checkbook. (Id.). He is also able to perform certain household chores, such as vacuuming and mowing the grass.[10] (R. 174).

While Plaintiff is able to perform some activities, he describes how others prove more difficult due to his impairments. Plaintiff's impairments affect his abilities to: lift, squat, bend, stand, reach, walk, sit, kneel, talk, climb stairs, recall information, complete tasks, concentrate, comprehend information and get along with others. (R. 177). He explains that he must lay down after performing physical activities due to his pain. (Id.). He estimates that he is able to walk 100 feet before needing to stop and rest. (Id.). He states that his pain interferes with his ability to sleep, requiring him to take a pain pill to fall asleep and limiting his sleep to four- to five-hour intervals. (R. 173). He further states that his sinus problems "put [him] in [a] type of fog" that interferes with his ability to perform certain mental activities. (R. 177). Regarding his ability to socialize with others, Plaintiff states that he is unable to engage in social activities because he is "stuck at home" and because he experiences difficulty being around people wearing deodorants and perfumes. (R. 176-77).

---

[10] Plaintiff explained that, while he mows the grass every two weeks, he lays around for two to three days afterward. (R. 174). During the administrative hearing, Plaintiff testified that he mows the yard with a riding mower. (R. 39).

Finally, Plaintiff details his daily activities.[11] On a typical day, Plaintiff awakens and then takes his morning medication. (R. 173). He then eats breakfast, takes pain medication, checks the weather and "walk[s] through the house trying to lo[osen] up." (Id.). After loosening up, he feeds his dog, rinses out his sinuses, takes more pain medication and watches television. (Id.). He estimates that he goes outside two to three times a day "on a good day." (R. 175).

### 2. Personal Pain Questionnaire

On January 31, 2013, Plaintiff, assisted by an "Outreach Coordinator," submitted a Personal Pain Questionnaire. (R. 154-58). In this questionnaire, Plaintiff declares that he suffers from pain in his feet and in his sinuses, neck, lower back and left hand. (R. 154). Regarding the pain in his feet, Plaintiff characterizes the pain as burning, stabbing tingling and continuous in nature. (R. 155). He explains that standing and walking exacerbate the pain and that soaking in Epsom salts eases the pain. (R. 155-56). To treat the pain, Plaintiff states that he is prescribed gabapentin and hydrocodone/acetaminophen, which he describes as "[n]ever" effective. (R. 156).

Regarding Plaintiff's sinus, neck, lower back and left hand pain, Plaintiff characterizes the pain as aching, burning, stabbing, stinging, tingling and continuous in nature. (R. 154). He further characterizes the pain in his left hand as "num[bing] pain." (Id.). He explains that, while the pain is constant, he sometimes experiences sharp, stabbing pains "that stop [him] cold" and require him "to find a place to lay down." (Id.). He states that certain activities exacerbate the pain, including getting in and out of vehicles, picking up items on the floor and lifting objects, and that laying down, using a

---

[11] On October 10, 2014, Plaintiff submitted a form entitled "Claimant's Medications," stating that his daily medications include: (1) the inhaler Spiriva for his breathing; (2) triazolam for a sleep aid; (3) Nasacort for allergies and (4) Zantac for acid reflux. (R. 211).

heating pad and taking hot showers relieves the pain. (Id.). He further states that, like

for his foot pain, he takes gabapentin and hydrocodone/acetaminophen for the pain,

which are "[n]ever" effective. (R. 155).

## IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following

criteria:

> [The] individual . . . [must have a] physical or mental impairment or
> impairments . . . of such severity that he is not only unable to do his
> previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such work exists in
> the immediate area in which he lives, or whether a specific job vacancy
> exists for him, or whether he would be hired if he applied for work. . . .
> '[W]ork which exists in the national economy' means work which exists in
> significant numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B). The Social Security Administration uses

the following five-step sequential evaluation process to determine whether a claimant is

disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing
> substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your
> impairment(s). If you do not have a severe medically determinable physical
> or mental impairment that meets the duration requirement [of twelve
> months] . . . or a combination of impairments that is severe and meets the
> duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your
> impairments(s). If you have an impairment(s) that meets or equals one of
> our listings . . . and meets the duration requirement, we will find that you
> are disabled.

> [Before the fourth step, [your RFC] . . . is evaluated "based on all the
> relevant medical and other evidence in your case record . . . ."]

(iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520 & 416.920. In steps one through four, the burden is on the claimant to prove that he or she is disabled and that, as a result of the disability, he or she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d 802, 804 (4th Cir. 1978). Once the claimant so proves, the burden of proof shifts to the Commissioner at step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled during any of the five steps, the process will not proceed to the next step. 20 C.F.R. §§ 404.1520 & 416.920.

## V.     ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the Social Security Administration's five-step sequential evaluation process, the ALJ found that:

1.     The claimant meets the insured status requirements of the Social Security Act through March 31, 2015.

2.     The claimant has not engaged in substantial gainful activity since May 20, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.     The claimant has the following severe impairments: degenerative disc disease of the lumbar spine; chronic obstructive pulmonary disease (COPD); generalized arthralgia; status-post bilateral foot contusion (20 CFR 404.1520(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of

the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the [RFC] to perform medium work as defined in 20 CFR 404.1567(c), except he can frequently kneel, balance, crouch, and climb ramps and stairs. He can occasionally stoop, crawl, and climb ladders, ropes, and scaffolds. He must avoid even moderate exposure to extreme temperatures, excess humidity, pollutants, and pulmonary irritants. The claimant should avoid concentrated exposure to hazardous machinery, working on vibrating surfaces, and unprotected heights. He can frequently reach overhead.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on August 7, 1959[,] and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability date. The claimant subsequently changes age category to advanced age (20 CFR 404.1563).

8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from May 20, 2010, through the date of this decision (20 CFR 404.1520(g)).

(R. 12-20).

# VI.  DISCUSSION

## A.  Contentions of the Parties

In his Motion for Summary Judgment, Plaintiff contends that the Commissioner's decision is not supported by substantial evidence and contains errors of law. (Pl.'s Mot. at 1). Specifically, Plaintiff contends that the ALJ improperly assessed his RFC and his credibility. (Pl.'s Br. in Supp. of her Mot. for Summ. J. ("Pl.'s Br.") at 3 & 10, ECF No. 8). Plaintiff requests that the Court reverse the Commissioner's decision or, alternatively, remand the case for a new administrative hearing. (Pl.'s Mot. at 1).

Alternatively, Defendant contends in her Motion for Summary Judgment that the Commissioner's decision is supported by substantial evidence. (Def.'s Mot. at 1). To counter Plaintiff's arguments, Defendant contends that the ALJ properly assessed Plaintiff's RFC and credibility and that the RFC and credibility determinations are supported by substantial evidence. (Def.'s Br. in Supp. of her Mot. for Summ. J. ("Def.'s Br.") at 7 & 12, ECF No. 11). Defendant requests that the Court affirm the Commissioner's decision. (Def.'s Mot. at 1).

## B.  Scope of Review

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether the ALJ applied the proper legal standards and whether the ALJ's factual findings are supported by substantial evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). A "factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Likewise, a factual finding by the ALJ is not binding if it is not supported by substantial evidence. Richardson v. Perales, 402 U.S.

389, 401 (1971). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Id. (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). When determining whether substantial evidence exists, a court must "not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ's]." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005).

**C.    Analysis of the Administrative Law Judge's Decision**

**1.  Whether the ALJ Properly Assessed Plaintiff's RFC**

Plaintiff argues that the ALJ improperly assessed Plaintiff's RFC. (Pl.'s Br. at 3). Specifically, Plaintiff argues that the ALJ: (1) failed to set forth a narrative discussion of the evidence describing how the evidence supported the RFC determination; (2) failed to include in the RFC any limitation caused by Plaintiff's bilateral foot injuries, despite determining at step two that the injuries were severe in nature, and (3) failed to properly consider the examination findings of Dr. Webb. (Id. at 6-9). Defendant argues that the ALJ properly assessed Plaintiff's RFC and that the RFC determination is supported by substantial evidence. (Def.'s Br. at 7-12).

The "ultimate responsibility for determining a claimant's RFC is reserved for the ALJ, as the finder of fact." Farnsworth v. Astrue, 604 F. Supp. 2d 828, 857 (N.D. W. Va.

2009). When performing an RFC assessment, an ALJ "must first identify the [claimant's] functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis,"[12] including the claimant's physical abilities, mental abilities and "other work-related abilities." Williams v. Comm'r of Soc. Sec., No. 3:14-CV-24, 2015 WL 2354563, at *4 (N.D. W. Va. May 15, 2015). After the ALJ completes this "function-by-function analysis[,] . . . he [may] express the RFC in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." Id. The RFC "assessment must [then] include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Id. The ALJ's narrative discussion, however, need not "address every piece of evidence or testimony in the record, [although it] . . . must provide some glimpse into the reasoning behind [the] decision to deny benefits." Zurawski v. Halter, 245 F.3d 881, 888 (7th Cir. 2001). Keeping these rules in mind, the undersigned will examine each of Plaintiff's arguments in turn.

In the present case, the ALJ determined that Plaintiff possesses the RFC to perform medium work with certain limitations. (R. 14). Specifically, the ALJ determined that Plaintiff possesses the following limitations: (1) he may frequently kneel, balance, crouch and climb ramps/stairs; (2) he may occasionally stoop, crawl and climb ladders/ropes/scaffolds; (3) he must avoid moderate exposure to extreme temperatures, excess humidity, pollutants, and pulmonary irritants; (4) he must avoid concentrated exposure to hazardous machinery, vibrations and unprotected heights and (5) he may

---

[12] The undersigned notes that the ALJ is required "to 'consider, not articulate' a claimant's RFC on a function-by function basis." Herrera v. Astrue, 893 F. Supp. 2d 933, 942 (N.D. Ill. 2012) (internal citations omitted).

frequently reach overhead. (Id.). The ALJ reasoned that this RFC assessment was supported by the objective medical evidence of record, Plaintiff's daily activities and the opinions of the state agency physicians. (R. 19). The ALJ then explicitly set forth his reasoning over the course of approximately six pages in sections entitled "Allegations," "Medical evidence of record," "Credibility" and "Opinion evidence." (R. 14-19).

The undersigned finds that the ALJ properly assessed Plaintiff's RFC. Plaintiff argues that the ALJ failed to set forth a narrative discussion of the evidence describing how the evidence supported the RFC determination. (Pl.'s Br. at 6). While Plaintiff acknowledges that the ALJ "recite[d] a summary of both [Plaintiff's] testimony and the medical evidence," he reasons that the ALJ "did not explain the genesis of the restrictions contained within the [RFC] assessment." (Id.). Plaintiff provides an example, contending that the ALJ "did not explain the basis for her findings that . . . Plaintiff was limited to medium exertional-level work, was limited to frequent kneeling, balancing, crouching, and climbing stairs and ramps, [etc.]" (Id.). The undersigned disagrees. Contrary to Plaintiff's argument, the ALJ did more than merely list or summarize the evidence or record. The ALJ discussed the evidence and explained which evidence she found credible and why. After reviewing the credited evidence, the geneses of the limitations contained in the RFC become apparent. To illustrate, the ALJ credited the opinions of Dr. Shane and Dr. Gaziano, who opined that Plaintiff is able to: perform medium-exertional work; frequently kneel, balance and climb ramps/stairs; occasionally crawl; avoid concentrated exposure to hazardous machinery and unprotected heights and frequently reach overhead. Therefore, regarding these limitations, the opinions of Drs. Shane and Gaziano and the RFC assessment are identical.

Regarding Plaintiff's ability to be exposed to extreme temperatures, humidity, pollutants and pulmonary irritants, the ALJ found that Plaintiff is more limited than what Drs. Shane and Gaziano had opined. However, the ALJ clearly found increased limitations due to Plaintiff's complaints of worsening breathing problems "when it is hot and humid" and when exposed to allergies, strong odors and perfumes. (R. 14, 17). Regarding Plaintiff's ability to stoop, crouch and climb ladders/ropes/scaffolds, the ALJ seemingly altered these limitations from the opinions of Drs. Shane and Gaziano due to Plaintiff's daily activities. (See R. 19) (stating that the RFC determination is supported by, *inter alia*, Plaintiff's daily activities). Finally, regarding Plaintiff's ability to be around vibrating surfaces, the ALJ attempted to restrict Plaintiff from dangerous situations such as working with hazardous machinery, vibrating surfaces and unprotected heights. The ALJ's decision due to restrict Plaintiff from dangerous situations appears due to, *inter alia*, his history of accidents. (R. 16). Therefore, the ALJ's narrative discussion of the evidence sufficiently articulated how she reached the RFC, which is all that was required of her.

Plaintiff also argues that the ALJ failed to include in the RFC any limitation caused by Plaintiff's bilateral foot injuries, despite determining at step two that the injuries were severe in nature. (Pl.'s Br. at 8). Plaintiff is correct that, at step two of the sequential evaluation process, the ALJ determined that Plaintiff's severe impairments included "status-post bilateral foot contusion[s]." (R. 12). The ALJ then noted at step four that Plaintiff alleges that he is limited in his ability to stand and walk for long periods of time due to his foot impairments. (R. 14-15). However, the ALJ determined that these allegations were less than fully credible. (R. 17). As will be discussed infra, the ALJ's

credibility determination of Plaintiff is supported by substantial evidence, making it reasonable for the ALJ to exclude Plaintiff's discredited allegations of limitations from the RFC. Plaintiff does not allege any additional limitation caused by his foot impairments that the ALJ failed to consider. Therefore, the ALJ's decision to exclude any limitations regarding Plaintiff's foot impairments is supported by substantial evidence. The undersigned also notes that, despite Plaintiff's argument, an "ALJ is not required, as a matter of law, to include all the limitations from the impairments the ALJ deems to be severe at step two in the ALJ's final RFC analysis." Gunderson v. Astrue, 371 F. App'x 807, 809 (9th Cir. 2010) (noting that the two steps "require different levels of severity"); see also Navedo v. Colvin, No. 15-CV-30051-KAR, 2016 WL 3029943, at *12 (D. Mass. May 25, 2016).

Finally, Plaintiff argues that the ALJ "failed to properly [discuss] the examination findings of Dr. Webb, contained in the Disability Determination Examination dated April 15, 2013. (Pl.'s Br. at 9). Plaintiff explains that, while the ALJ "mentioned Dr. Webb's report, . . . she failed to mention" specific findings in the report that are beneficial to Plaintiff.[13] (Id.). An ALJ is required to *consider* all of the relevant medical evidence submitted by a claimant. 20 C.F.R. § 404.1520. However, an ALJ is "not obligated to *comment on* every piece of evidence presented." Pumphrey v. Comm'r of Soc. Sec.,

---

[13] The ALJ failed to explicitly indicate the weight she assigned to Dr. Webb's opinion. However, the ALJ clearly did not credit the opinion and provided her reasons for doing so. (See R. 16, 19) (noting that the RFC is supported by the objective medical evidence of record, Plaintiff's daily activities and the opinions of the state agency physicians). Therefore, any error on the part of the ALJ was harmless in nature. See Spurlock v. Astrue, No. 3:12-CV-2062, 2013 WL 841474, at *20 (S.D. W. Va. Jan. 28, 2013) R&R adopted sub nom. Spurlock v. Asture, No. CIV.A. 3:12-2062, 2013 WL 841483 (S.D. W. Va. Mar. 6, 2013) (stating that "an ALJ's failure to explicitly state the weight he gave to a particular medical opinion constitutes harmless error, so long as the weight given to the opinion is discernible from the decision and any grounds for [counting or] discounting it are reasonably articulated").

No. 3:14-CV-71, 2015 WL 3868354, at *3 (N.D. W. Va. June 23, 2015); <u>Reid</u>, 769 F.3d at 865 (stating that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision"). In the present case, the ALJ obviously considered Dr. Webb's Disability Determination Examination. (R. 16). Indeed, the ALJ discussed Dr. Webb's report in a large paragraph in her written decision. (<u>Id.</u>). The undersigned finds, therefore, that the ALJ sufficiently discussed Dr. Webb's report, even if she did not note every finding contained in the report and that Plaintiff's argument is without merit. Consequently, the ALJ's RFC determination is supported by substantial evidence.

### 2. Whether the ALJ Properly Assessed Plaintiff's Credibility

Plaintiff argues that the ALJ erred in determining that Plaintiff is "less than fully credible." (Pl.'s Br. at 10). Specifically, Plaintiff argues that the ALJ applied an improper legal standard when evaluating Plaintiff's pain and that the ALJ failed to explain which of Plaintiff's subjective complaints she found credible and which she did not. (<u>Id.</u> at 11-12). Defendant argues that the ALJ properly assessed Plaintiff's credibility and that the ALJ's credibility determination is supported by substantial evidence. (Def.'s Br. at 12).

"[T]he determination of whether a person is disabled by pain or other symptoms is a two-step process." <u>See</u> <u>Craig v. Chater</u>, 76 F.3d 585, 594 (4th Cir. 1996); <u>see also</u> 20 C.F.R. § 404.1529(c)(1) (2011); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated, through objective medical evidence, that a medical impairment exists that is capable of causing the degree and type of pain alleged. <u>See</u> <u>Craig</u>, 76 F.3d at 594. Second, the ALJ must consider the credibility of the claimant's subjective allegations of pain in light of the entire record. <u>Id.</u>

Social Security Ruling 96-7p[14] sets out several factors, in addition to the objective medical evidence, for an ALJ to consider when assessing the credibility of a claimant's subjective symptoms and limitations, including:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for [fifteen] to [twenty] minutes every hour, or sleeping on a board), and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). An ALJ need not document specific findings as to each factor. Wolfe v. Colvin, No. 3:14-CV-4, 2015 WL 401013, at *4 (N.D. W. Va. Jan. 28, 2015). However, the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186 at *2. Because the ALJ has the opportunity to

---

[14] On March 16, 2016, SSR 96-7p was superseded by SSR 16-3p. Nevertheless, because SSR 16-3p was not issued until after the date of the ALJ's decision, the undersigned will review whether the ALJ's decision comports with SSR 96-7p, the ruling that was applicable on the date of the ALJ's decision.

observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. <u>Shively</u>, 739 F.2d at 989-90. This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." <u>Ryan v. Astrue</u>, No. 5:09CV55, 2011 WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011). If the ALJ meets his or her basic duty of explanation, then "an ALJ's credibility determination [will be reversed] only if the claimant can show [that] it was 'patently wrong.'" <u>Sencindiver v. Astrue</u>, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010) (quoting <u>Powers v. Apfel</u>, 207 F.3d 431, 435 (7th Cir. 2000)).

In the present case, the undersigned finds that the ALJ properly followed the two-step process when determining that Plaintiff is "less than fully credible." (R. 17). Initially, the ALJ determined that Plaintiff had proved that she suffers from medical impairments that "could reasonably be expected to cause the alleged symptoms." (<u>Id.</u>). Then, after examining the factors outlined in SSR 96-7p, the ALJ further determined that Plaintiff's "statement[s] concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" in light of the entire record. (<u>Id.</u>).

### i. Plaintiff's Daily Activities

The ALJ considered Plaintiff's daily activities (factor one) when making her credibility determination. (R. 18). Specifically, the ALJ noted that Plaintiff's routine activities include "using tractor equipment and mowing his lawn." (<u>Id.</u>). The ALJ also noted that Plaintiff's primary care physician encouraged him to exercise more. (<u>Id.</u>). Therefore, the ALJ concluded that, "[g]iven the complaints of disabling symptoms and limitations, [Plaintiff's] activities are not limited to the extent one would expect." (<u>Id.</u>).

### ii. Plaintiff's Pain and Other Symptoms

The ALJ also reviewed the location, duration, frequency and intensity of Plaintiff's pain and other symptoms (factor two) and the factors that precipitate and aggravate those symptoms (factor three). Regarding Plaintiff's symptoms, the ALJ noted that Plaintiff complains of pain and numbness in his right fourth and fifth fingers, neck pain, lower back pain, poor sleep/insomnia, breathing problems and foot pain. (R. 14-15). After noting Plaintiff's symptoms, the ALJ recorded that Plaintiff "has not consistently complained of" these symptoms. (R. 18).

Regarding factors that precipitate/aggravate those Plaintiff's symptoms, the ALJ documented that Plaintiff's breathing problems are precipitated/aggravated by hot and humid weather. (R. 14). The ALJ further documented that standing for long periods of times precipitates/aggravates Plaintiff's foot pain. (R. 15).

### iii. Plaintiff's Medications

The ALJ generally discussed the medication that Plaintiff is prescribed for his symptoms (factor four). For example, the ALJ noted that Plaintiff uses only routine and/or conservative medications for his pain, insomnia, allergies and breathing problems. (R. 18). The ALJ then noted that Plaintiff's medications "ha[ve] been [largely] successful in controlling [his] symptoms." (See R. 17).

### iv. Other Treatment and Measures Used to Relieve Symptoms

Next, the ALJ reviewed treatment other than medication that Plaintiff has received for relief of his symptoms (factor five) as well as measures Plaintiff uses to relieve his symptoms on her own (factor six). Regarding treatment other than medication that Plaintiff has received for his symptoms, the ALJ documented several

34

findings. To illustrate, the ALJ noted that Plaintiff participated in physical therapy in 2009 after his motor vehicle accident and that, after 2009, Plaintiff never participated in physical therapy again, despite complaining of joint pain. (R. 15, 18). The ALJ noted that Plaintiff was never treated by an orthopedist for his joint pain, was never treated by "a sleep [specialist] or underwent a sleep study" for his insomnia and was never treated by a pulmonologist for his allergies and COPD. (R. 17-18). The ALJ noted that "none of [Plaintiff's] doctors ha[ve] placed limitations [or restrictions] on [him]." (R. 18-19). The ALJ noted that Plaintiff "has not been entirely compliant in following prescribed treatment," reasoning that Plaintiff continued to smoke "against medical advice [and] despite . . . many warnings against this behavior." (R. 18). Finally, the ALJ noted Plaintiff's largely conservative treatment history. (R. 17). Consequently, the ALJ concluded that Plaintiff's treatment history is incongruous with Plaintiff's allegations of disabling impairments. (Id.).

As for measures Plaintiff uses to relieve his symptoms on his own, the ALJ noted that Plaintiff rests in a dark environment to relieve his allergy headaches and that he applies heat to his lower back to relieve his back pain. (R. 14, 17). The ALJ also noted that Plaintiff's uses a cane to help him walk. (R. 14).

### v.   Objective Medical Evidence

Finally, the ALJ considered the objective medical evidence contained in the record. Specifically, the ALJ stated:

> Even though the undersigned acknowledges that pain is not always accompanied by objective evidence, objective evidence can bolster a claimant's complaints of pain. In this case, as discussed above, the objective medical evidence, including diagnostic imaging, testing, and physical examination results show only mild or no abnormalities.

(R. 18).

Plaintiff argues that the ALJ applied an improper legal standard when analyzing his credibility, contending that the ALJ required him to establish the intensity, persistence and limiting effects of his pain with objective medical evidence. (Pl.'s Br. at 11-12). The undersigned disagrees. SSR 96-7p specifically states that, when an ALJ is assessing a claimant's credibility, the ALJ should consider the seven identified factors *in addition to* the objective medical evidence. SSR 96-7P, 1996 WL 374186, at *3 (describing "the kinds of evidence, including the factors before, that the adjudicator must consider *in addition to the objective medical evidence* when assessing the credibility of an individual's statements") (emphasis added). Therefore, while "allegations concerning the intensity and persistence of pain or other symptoms may not be disregarded *solely* because they are not substantiated by objective medical evidence . . . the absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is . . . one factor that the adjudicator *must* consider in assessing an individual's credibility." Id. (emphasis added). In the present case, the ALJ clearly did not discredit Plaintiff solely because his statements were not substantiated by objective medical evidence. Instead, the ALJ considered the objective medical evidence as one factor in his assessment of Plaintiff's credibility, which he was required to do. Consequently, Plaintiff's argument is without merit.

### vi. Substantial Evidence Supports the ALJ's Credibility Determination

After a careful review of the ALJ's decision and the evidence of record, the undersigned finds that the ALJ's credibility determination is sufficiently specific to make

clear her reasoning in finding Plaintiff less than fully credible.[15] Thus, the burden was on

Plaintiff to show that the ALJ's credibility determination is patently wrong. Plaintiff failed

to meet this burden. Consequently, the undersigned accords the ALJ's credibility

determination the great weight to which it is entitled.

## VII.   RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying

Plaintiff's application for DIB is supported by substantial evidence. Accordingly, I

**RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 7) be **DENIED**,

Defendant's Motion for Summary Judgment (ECF No. 10) be **GRANTED**, the decision

of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this

Report and Recommendation, file with the Clerk of the Court written objections

identifying the portions of the Report and Recommendation to which objections are

made and the basis for such objections. A copy of such objections should also be

submitted to the Honorable John Preston Bailey, United States District Judge. Failure to

timely file objections to the Report and Recommendation set forth above will result in

---

[15] Plaintiff argues that the ALJ failed to identify which of Plaintiff's subjective complaints she found credible and which she did not. (Pl.'s Br. 12). The undersigned disagrees for several reasons. First, the ALJ clearly stated that she found all of Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms to be "less than fully credible." (R. 17; see also R. 19) (omitting Plaintiff's subjective complaints when listing the evidence that the ALJ credited when determining Plaintiff's RFC, which included the objective medical evidence of record, Plaintiff's daily activities and the opinions of the state agency physicians). Second, while Plaintiff cites Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015) to support his argument that the ALJ committed a reversible error, Mascio is factually distinguishable from the instant case. To illustrate, in Mascio, the ALJ chose to credit some of the plaintiff's statements when determining the plaintiff's RFC but did not explain why he chose to discredit plaintiff's other statements. Mascio, 780 F.3d at 639-40. However, in the present case, the ALJ clearly explained why she discredited all of Plaintiff's subjective statements. Moreover, in Mascio the Court stated that, had the ALJ properly analyzed the plaintiff's credibility, as the ALJ did in the present case, the ALJ's error would have been harmless in nature. Id. at 639. Therefore, Plaintiff's argument lacks merit.

waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841, 845-48 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140, 155 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 17th day of April, 2017.

_____
ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE